William Ace HATCHER, Appellant,

v.

FLOYD CHARCOAL, Respondent.

No. 16240.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 13, 1989.

Martin Mazzei, Mazzei and Broshot, Steelville, for appellant.

Cyril M. Hendricks, Grant W. Smith, Spencer & Hendricks, Jefferson City, for respondent.

CROW, Presiding Judge.

William Ace Hatcher ("claimant") appeals from a final award denying compensation by the Labor and Industrial Relations Commission ("Commission") in a proceeding under The Workers' Compensation Law, chapter 287, RSMo 1978, as amended. The Commission, by a two-to-one vote, affirmed an award of an administrative law judge ("ALJ") of the Division of Workers' Compensation, which denied benefits on the ground that claimant had not sustained an injury arising out of and in the course of his employment.

Claimant's sole assignment of error is that the Commission's decision was not supported by sufficient competent evidence as, in claimant's words, "there was no evidence of probative force to support the Commission's conclusions of no work related injury and a pre-existing injury by [claimant] and the Commission ignored competent, substantial and undisputed testimony of employer's expert witness." We synopsize only the evidence pertinent to that issue.

Claimant, a 19–year employee of Floyd Charcoal Company, testified he was working alone preparing to unhook wiring on a "heat sealer" conveyor in the "instant lite building" on his employer's premises between 11:30 a.m., and 12:00, May 31, 1985. Claimant explained he climbed onto the conveyor belt to reach a box where the wiring was. In doing so, said claimant, he "slipped and fell backwards" to the floor, some two and a half to three feet below, landing on his back. Asked whether he felt pain, claimant responded: "I just hurt. I gathered up my tools ... and went back up to the front of the warehouse." On cross-examination claimant acknowledged the fall occurred just after he had returned from lunch.

The first fellow employee claimant encountered after the alleged accident was Dennis Halbrook. Claimant testified he told Halbrook he (claimant) had hurt his back and that Halbrook might have to take him to the doctor.

Halbrook, a witness for claimant, recalled claimant was walking "in a bent over position" when claimant approached him. Halbrook remembered claimant saying he had hurt his back on "a ladder or a conveyor" and needed to go to the hospital.

About that time, according to claimant, Jack Land, a supervisor, "was coming along there." Claimant reported the injury to Land. Land testified, "I called the office on the radio to call the doctor, that [claimant] had fell and hurt himself." Asked what time this was, Land replied, "[A]pproximately quarter after 12:00." Land directed Halbrook to take claimant to the doctor.

Halbrook took claimant to a hospital; en route Halbrook heard claimant complain of pain in his back.

Eleanor Dixon, a friend of claimant, testified she was with him the evening before he was hurt. According to Eleanor, claimant was walking fine and had no pain. She had known claimant about a year before the accident, during which time claimant never said anything about back pain. Eleanor saw claimant leave for work about 6:30 a.m., May 31, 1985. He did not appear hurt and had no complaint about his back. Eleanor took claimant's lunch to his place of employment about 11:15 a.m., meeting claimant in the parking lot. Claimant walked "normally" to Eleanor's vehicle, entered, and ate lunch. Eleanor testified, "I was there till about five till 12:00 before he had to go back." Eleanor avowed claimant uttered no complaint about back pain during lunch.

Larry Whitaker, a friend of claimant, testified that claimant came to Whitaker's home to borrow a tool the night before claimant got hurt. Whitaker recalled claimant walking "normal." Two weeks earlier, according to Whitaker, claimant had hauled manure for Whitaker's garden and had unloaded it with a pitchfork. On

that occasion, said Whitaker, claimant had mentioned nothing about back pain or any back problem.

Garth Samuel Russell, an orthopedic surgeon specializing in injuries to the spine, examined claimant October 2, 1985, some four months after the alleged accident. Russell testified: "[E]xamination ... revealed a rigid back. It had severe muscle spasm, almost no movement in his back at all." Russell's diagnosis was a herniated disc. Russell performed surgery on claimant October 14, 1985, characterized by Russell as "a partial laminectomy at the L–5/S–1 area on the right side ... with a fusion from L–5 to the sacrum."

Asked to assume claimant's version of his fall was true, Russell testified: "It's my medical opinion, based upon reasonable medical certainty, based on [claimant's] history, based his physical examination and his clinical course that his injury to his back did [occur] as a result of the fall which he stated occurred on May the 31st of 1985." Russell assessed claimant's injury as "a permanent partial impairment of 35 percent as rated at the lumbar spine or whole body."

Maintenance foreman Jerry Enke, a 16–year employee of Floyd Charcoal, testified he walked with claimant to the instant lite building prior to 10:30 a.m., May 31, 1985, "to check the voltage on the heat sealer to take it out and install another sewing machine." As they walked, said Enke, claimant remarked that "his back was hurting him." Enke's testimony:

"Q ... Did he mention ... anything that he wanted done as far as his back?

A No. Just had to do something, it was hurting him.

. . . .

Q ... when you were with [claimant] that morning, was he walking bent over in pain?

A Somewhat, kind of walking slow.

Q Walking slow. But he wasn't doubled over in pain, was he?

A No.

. . . .

Q Are you familiar with disconnecting the voltage from the heat seal?

A Mm-hmm.

Q Your opinion, would it be necessary to climb on the conveyor to disconnect the wiring?

. . . .

A No.

. . . .

Q You said it's not necessary to climb on the conveyor to get to the box?

A No. You can get reach it from standing on the floor.

Q Okay. You could get on it, though, to get to the box?

A You could, yeah.

. . . .

Q Would it be difficult if you climbed on the conveyor?

A Well, it would be inconvenient. You'd have to squat down after you got up on the conveyor; you'd be too tall.

. . . .

Q That depends on how tall you are?

A Right.

Q Might be more convenient for a short man to get on the belt, wouldn't it?

A Yeah."

Don Cochran, another foreman, testified he was working with claimant in the maintenance shop "[r]ight before noon" May 31, 1985. Cochran recounted, "[Claimant] said when we got up ... to go to dinner ... he thought he was going to have to go to the doctor because his back was bothering him."

Don Ray Shipley, a bagging room foreman and 12–year employee of Floyd Charcoal, works in the instant lite area of the north warehouse and resides "less than a quarter of a mile from the plant." May 31, 1985, was his day off. Shipley testified, however, that Jerry Enke came to Shipley's house "about 10:00 o'clock" that morning and informed him the plant was "going to start a ... bagging operation and I had to come over and get everything set up ready to go for it." Shipley departed for the plant "[b]etween 11:15 and 11:30." Asked how he remembered the time, Shipley replied: "My wife had just fixed my lunch. I finished eating it and then I went on over."

According to Shipley, he arrived at the instant lite building at 11:30 and commenced working within five feet of the heat sealer. Shipley avowed he remained in that area until about 1:30. Shipley's testimony:

"Q While you were in the instant lite building, did you hear ... anything on your radio?

A Yes. At 12:19 Jack Land called over the radio that they had to get ahold of Halbrook to take [claimant] to the hospital, he had fallen up in instant lite and hurt his self [sic].

Q Was there anything unusual about that?

A Well, yeah, because I had been up there since 11:30, and I had never seen [claimant] that day.

Q ... And during the time from the time you went to work until you heard the radio message, were you in the area of the heat sealer?

A Yes. I never left it.

Q Okay. Were the lights on at that time?

A Yes, sir. They're always on.

Q Was there anything that would have prevented you during that period of time from seeing anyone working on the heat sealer?

A Nothing.

. . . .

Q And during that period of time, from the time you were in the instant lite building, did you ever see [claimant]?

A No, sir.

Q Did you ever hear him call out or did you ever hear any noise, or was there any evidence of anyone being present in that area?

A No, sir."

The ALJ, in his findings of fact and rulings of law, reviewed the evidence, observing that Shipley testified "in a very credible manner." The ALJ concluded:

"Although [claimant] testified to a compensable incident, it is my opinion that [claimant's] Claim for Compensation must be denied on the basis of overwhelming testimony, which indicates that [claimant] had a preexisting back prob-lem and did not sustain the accident (as testified to by ... Enke, ... Cochran and ... Shipley).

Accordingly, [claimant's] Claim for Compensation is denied and benefits are not allowed."

On application for review by claimant, two members of the Commission found that the ALJ's award was supported by competent and substantial evidence, and adopted a final award denying compensation. The ALJ's award was made part of the Commission's award. The third member of the Commission dissented, finding the testimony of claimant and his witnesses "far more credible" than that of the employer's witnesses.

The scope of our review is established by § 287.495.1, RSMo 1986, which provides in pertinent part:

"... Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

. . . .

(4) That there was not sufficient competent evidence in the record to warrant the making of the award."

Certain well established principles of appellate review in workers' compensation cases are set forth in *Jordan v. D & L Custom Wood Products*, 767 S.W.2d 378, 380 (Mo.App.1989), accompanied by ample citation of authority:

"We review the Commission's award, not that of the ALJ. [citations omitted] The Commission's award may be overturned only if it is not supported by substantial evidence or if it is clearly contrary to the overwhelming weight of the evidence. [citation omitted] Consequently, our duty is to determine from the record as a whole whether the Commission could reasonably have made its findings and award, reviewing the record in the light most favorable to the find-

ings of the Commission. [citation omitted] The Commission is the sole judge of the weight of the evidence and the credibility of the witnesses. [citations omitted] If the competent evidence or permissible inferences are conflicting the choice rests with the Commission and is binding upon us. [citations omitted]."

Claimant acknowledges these rules, but maintains that "even using this almost impossible test, the award of the commission must be reversed and this court should substitute its judgment for the judgment of the commission." Claimant insists two of the ALJ's findings—adopted by a majority of the Commission—are not supported by substantial evidence.

The first such finding, according to claimant, is the finding that claimant "had a preexisting back problem." Claimant, as we understand his brief, argues that if the Commission's finding was that claimant's herniated disc existed prior to May 31, 1985, an injury that severe would probably have kept him from reporting for work that date, and would have undoubtedly prevented him from performing any work prior to lunch. In that regard claimant emphasizes foreman Cochran testified claimant carried out a task requiring bending and squatting just before noon.

Claimant asserts the only evidence to support the Commission's finding that he had a preexisting back problem was the testimony of Enke and Cochran. Claimant asks why, if he were trying to "rip off" his employer by filing a fraudulent workers' compensation claim, he would tell two individuals his back was hurting before he faked an injury. Claimant cites *Chilton v. General Motors Parts Div.*, 643 S.W.2d 304 (Mo.App.1982), where the issue was whether the employee's injury was sustained on the job (as he testified) or while he was playing ball (as two fellow employees testified he had admitted). The Commission found for the employee; the appellate court upheld that finding, noting that the ALJ and the Commission had chosen to believe the employee and the court was not

permitted to substitute its judgment for that of the Commission. *Id.* at 306.

Had the Commission found for claimant in the instant case, *Chilton* would have helped claimant preserve the victory on subsequent judicial review. Here, however, a majority of the Commission chose to disbelieve claimant and his witnesses. *Chilton* illustrates that the Commission, not a reviewing court, determines credibility.

Another reason, according to claimant, that the Commission's finding of a preexisting back problem was not supported by substantial evidence is that Dr. Russell[1] was of the opinion that claimant's injury was sustained when he fell at work May 31, 1985. Claimant emphasizes that the only mention by Russell of a preexisting back problem was Russell's finding of degenerative arthritic changes "at the L–5/S–1 disc space," which as a general rule develop over a period of years and are not caused by trauma. Claimant argues that inasmuch as the ALJ "did not make a finding on Dr. Russell's testimony" one can only conclude the ALJ probably disregarded or totally ignored such testimony.

We do not share that conclusion. Russell, it will be remembered, did not see claimant until four months after the alleged accident and, in expressing his opinion, Russell was asked to assume claimant's version of the accident was true. It is possible, of course, that claimant's injury resulted from trauma other than the fall he described.

Contrary to appellant's argument, there was evidence to support the finding that he had a preexisting back problem. Enke testified that on May 31, 1985, prior to 10:30 a.m., claimant stated he had to do something about his back, as it was hurting him. Cochran testified that before noon May 31, 1985, claimant said he thought he was going to have to go to the doctor because his back was bothering him. We reject claimant's thesis that the Commission's finding of a preexisting back problem was not supported by substantial evidence.

---

1. Claimant characterizes Russell as "the employer's expert witness," evidently because Russell's bills for claimant's treatment were paid by the employer's insurer. Russell, however, testified (by deposition) at the instance of claimant.

The second finding that, according to claimant, is unsupported by substantial evidence is the finding that he "did not sustain the accident." Claimant attacks the testimony of Shipley, the key witness on this issue, as "wildly inconsistent." Claimant refers us to passages from the opinion of the dissenting member of the Commission who was skeptical of Shipley's testimony.

In studying the dissent we notice that the dissenter misunderstood Shipley's testimony in one crucial respect. The dissenter states Shipley testified Enke came to Shipley's house at 11:15 a.m., May 31, 1985, to summon Shipley to work. Given Shipley's testimony that he finished his lunch, went to the plant, picked up his radio, and then proceeded to the instant lite building, the dissenter found that Shipley reached the latter area between noon and 12:15 p.m.; consequently, it was likely claimant had fallen before Shipley arrived. The flaw in that deduction is that Shipley testified Enke arrived at Shipley's house "about 10:00 o'clock," not 11:15 as the dissenter mistakenly thought.

The dissenter also misinterpreted the evidence in another respect. The dissent states Enke testified he saw claimant when the two of them went to the instant lite building to check the voltage on the heat sealer, while Shipley testified claimant was not in the instant lite building from 11:30 to 1:30. The dissenter concludes that some or all of the testimony is untruthful.

That conclusion does not necessarily follow. Enke, as reported earlier, testified he went with claimant to the instant lite building prior to 10:30 a.m., hence there is no conflict between Enke's testimony and Shipley's testimony that he (Shipley) did not see claimant in the instant lite building between 11:30 and 1:30.

As the employer's brief points out, claimant's testimony fixed the time of the alleged fall between 11:30 and noon. Ms. Dixon reduced the time span even further, testifying claimant was with her until about five minutes before 12:00. Supervisor Land testified claimant reported the accident to him about 12:15, and Shipley testified he overheard Land's radio report

of the accident at 12:19. Shipley's testimony, if believed (as it was by the ALJ and two members of the Commission) established that claimant was not in the instant lite building—the place claimant said he fell—from 11:30 a.m., to 1:30 p.m. We reject claimant's argument that there was no substantial evidence to support the finding that claimant "did not sustain the accident."

As said in *Jordan:*

"We may not substitute our judgment for that of the Commission as to questions of fact, [citations omitted] as conflicts in the evidence are for resolution by the Commission. [citations omitted] We are bound to affirm the Commission's award if it is supported by competent and substantial evidence on the whole record, [citation omitted] even though a finding of the Commission to the contrary would have been supported by the evidence. [citations omitted]." 767 S.W.2d at 380–81.

This appeal is governed by those firmly entrenched principles. The Commission's final award denying compensation is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.